**UNITED STATES v. CHICAGO, B. & Q. R. CO.**

**UNITED STATES v. GULF, M. & O. R. CO.**

Nos. 10617, 10619.

United States Court of Appeals Seventh Circuit.

Oct. 16, 1952.

224

No. 10617:

Otto Kerner, Jr., U. S. Atty., Chicago, Ill., James M. McInerney, Asst. Atty. Gen., Leo Meltzer, Attorney, Department of Justice, Washington, D. C. (Walter F. J. Krawiec, Asst. U. S. Atty., Chicago, Ill., James O. Tolbert, Attorney, Interstate Commerce Commission, Washington, D. C., of counsel), for appellant.

Andrew C. Scott, C. W. Krohl, R. F. Casey, T. G. Schuster, J. L. Rice, Chicago, Ill., for appellee.

No. 10619:

Howard L. Doyle, U. S. Atty., Marks Alexander, Asst. U. S. Atty., Springfield, Ill., James M. McInerney, Asst. Atty. Gen., Leo Meltzer, Attorney, Department of Justice, Washington, D. C. (James O. Tolbert, Attorney, Interstate Commerce Commission, Washington, D. C., of counsel), for appellant.

Louis F. Gillespie, Frederick H. Stone, Springfield, Ill., Charles F. Turner, Mobile, Ala., for appellee.

Before MAJOR, Chief Judge, and DUFFY and SWAIM, Circuit Judges.

MAJOR, Chief Judge.

These two appeals, although separately taken, present for decision the same question, oral argument was heard on the same day and we think they may be appropriately disposed of in a single opinion. In No. 10617, the appeal is from the Northern District of Illinois, Eastern Division, from a judgment against the plaintiff in a case heard and decided by District Judge John P. Barnes. In No. 10619, the appeal is from the Southern District of Illinois, Southern Division, from a judgment also against the plaintiff in a case heard and decided by District Judge Charles G. Briggle. In each case, the judgment was entered in a civil action under the Safety Appliance Act, Title 45 U.S.C.A. §§ 1 to 16, and an order of the Interstate Commerce Commission issued pursuant thereto, dated June 6, 1910, which requires that when any train is operated with power or train brakes "not less than 85 per cent of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train, and all power-brake cars in every such train which are associated together with the 85 per cent shall have their brakes so used and operated."

In each case the defendant is a common carrier by railroad, engaged in interstate commerce, and is subject to the provisions of the Safety Appliance Act. In each, it is conceded that the defendant failed to have the required percentage of air brakes in operation on the movements in issue, and in each the failure was sought to be justified on the ground that the operation was not a train movement but merely a switching operation, admittedly not subject to the air-brake provisions of the Act.

Obviously, the sole question for decision in each case is whether the movement complained of was that of a "train." If that question be answered in the affirmative, as the government contends it should be, the statute was violated. On the other hand, if it was that of a switching operation, as the District Court in each case held, the statute was not violated. It is conceded on all sides, what the cases so abundantly disclose, that a decision in cases of the instant character must depend upon the facts of the particular case. In each of the cases before us, the court made detailed findings as to the evidentiary facts, but it is the conclusion drawn therefrom which is asserted to be erroneous as a matter of law.

The facts as found in No. 10617 are as follows: On October 4, 1949, the defendant moved a cut of twenty-three freight cars by its diesel locomotive from its Freight House yard, Aurora, Illinois, to its West yard, Eola, Illinois, a distance of slightly more than two miles, without the power brakes being in use on any of the cars. The movement was over a lead track which is located within a single railroad switching yard. Since 1922, defendant's main-line tracks between Chicago and Aurora have been carried upon an elevated grade, ten or more feet above the level of the switching lead track. The engines used for switching, including that used in the movement in issue, are manned by switching crews, and the entire operation is under the jurisdiction of a yardmaster. The movement was for the pur-

pose of switching freight cars, released at the freight house, to a point approximately two miles to the east, where they were incorporated into trains. The speed of the movement was eight to ten miles an hour, and no cars were picked up or set out enroute, although on other occasions cars were switched to and from a paper mill located midway between the freight house and the point at which trains are made up. The lead track is not used for the movement of through freight or passenger trains. However, two trains that switch between Eola and West Chicago traverse a portion of this switching lead track, but these trains operate only in the morning and evening and have only such rights over the lead track as are accorded to switch engines doing switching work. The movement in issue was made by a switching locomotive and crew, without caboose or markers, within the general yard limits and under the directions of the yardmaster. In making the movement, two public streets were crossed at grade, one a much traveled street protected by flasher lights and bell, the other a graveled highway with a crossbuck warning sign, which crossing was used only occasionally. Switches leading to and from the lead track to the mainline were controlled by an interlocking plant and protected by derails. Defendant's assistant master mechanic, with forty-five years of continuous service with the defendant, testified that in that period no accidents of any kind on this lead track resulted from the failure to use the automatic train brakes for switching movements, and that he knew of no accidents resulting in injury to the traveling public or anyone else at the two grade crossings.

The facts as found in No. 10619 are as follows: On December 4, 1950, the defendant moved a cut of thirty-three freight cars pulled by a diesel engine from the Venice, Illinois yard to the Terminal yard, the latter being immediately adjacent to the former. The movement was not made on any regular schedule but only when there were enough cars to warrant the use of an engine and a crew to make the transfer. The movement and all similar movements were made within yard limits, by switching crews and switch engines, under yard rules and under control and supervision of the yardmaster. The Venice yard is a terminal for freight trains. No passenger yard movements are involved in the operation of this yard. There, inbound freight trains are received and are broken up; outbound trains are made up in this yard for road movement. No freight trains pass through the yard. The yardmaster is located in a tower, has visual supervision of the movement and throughout the yard there is an intercommunication system which permits control by him of the entire movement. The movement in question, as well as similar movements, was made at the convenience of the defendant and the Terminal yard. When there were sufficient cars to warrant a transfer, the yardmaster of the defendant would contact the yardmaster of Terminal Railroad Association to ascertain if there was a track in their adjoining yard available to receive the cut of cars. If so, the yardmaster communicated with the switch foreman who arranged for the movement over a track through the Venice yard designated by the yardmaster. A movement may be made over any one of fifteen switching tracks. These tracks are used solely for switching, the making up and breaking up of trains. None of them are used for road movements.

The movement complained of, on December 4, 1950, commenced on Track 10 in the Venice yard and moved to the adjoining yard of the Terminal Railroad Association. The movement consisted of thirty-three cars which came into the Venice yard from four separate freight trains, all of which terminated at the Venice yard. The thirty-three cars were designated for the Terminal Railroad Association, and by the movement in question were transferred to the adjacent yard of such Association. Prior to the movement, the cars were situated on Track 10, which is approximately forty to fifty feet north of a paved street known as State Route 3. This is the only highway, either public or private, crossed by this or similar movements. This crossing is protected by a watchman. The speed of the movement in question over this

route was three miles per hour. The movement did not cross the main line tracks of the defendant railroad or any other railroad and the cut of cars did not touch or operate along the main line tracks of the defendant railroad or any other railroad. No road trains, either freight or passenger, are operated within the Venice yard. Within the past forty years, there has been no injury to a crew member of the defendant or to a member of the traveling public arising out of a movement similar to the one complained of. The movement was for a distance of approximately one and one-half miles within yard limits, consumed the time of thirty-nine minutes and the highest rate of speed was from four to five miles per hour.

Neither Congress nor the Interstate Commerce Commission has seen fit to define the meaning of the word "train" as employed in the Act. This perplexing problem unfortunately, so we think, has been left to the courts. After wrestling with it for some fifty years, courts have accomplished little other than to decide on the particular facts of the case whether the movement was that of a train within the meaning of the Act. It is apparent, therefore, that a holding in one case carries little weight as a rule for decision in another. Even when the facts of the case are disclosed, the question must depend largely upon the opinion or judgment of the court called upon to make a decision. And where the facts bring the case within the twilight zone, as we think they do in the cases before us, the opinion of one judge or court is likely to be as good as that of another.

The lack of any uniform definition as to what constitutes a train movement is aptly illustrated by two recent decisions, United States v. South Buffalo R. Co., 168 F.2d 948, decided by the Second Circuit, and United States v. Elgin, J. & E. Ry. Co., 182 F.2d 1, decided by this court. A fine-tooth comb is required to differentiate between the facts of the two cases. The Second Circuit, however, decided that the operation in question was a train movement and reversed the District Court, which had held that it was a switching movement.

On the other hand, this court decided on the facts before it that the operation was not a train movement and affirmed the District Court. These two cases with strikingly similar facts but with opposite results are typical of others which could be cited.

As this court remarked in United States v. Elgin, J. & E. Ry. Co., supra, 182 F.2d at page 3, referring to previous decisions, " * * * it appears significant to us that in the cases referred to, holding the provision applicable, the element of hazard has loomed large." In that case, there were two private crossings at grade over the tracks upon which the movement took place. There was evidence that for thirty-five years there had not been an accident or injury to any employee or other person resulting from operations of the type involved. In United States v. South Buffalo R. Co., supra, the movement crossed a single private crossing at grade. There was expert testimony, however, that such a grade crossing presented a grave danger.

Of the instant cases, the facts in No. 10617 are perhaps slightly more favorable to the plaintiff than those in No. 10619 in that in the former the track crossed two public highways, one of which was greatly and the other infrequently used. There was testimony, however, from a witness with forty-five years of continuous service with the defendant that during that period no accident of any kind had resulted from the failure to use automatic train brakes for switching movements, either to the employes of the defendant or to the traveling public. In No. 10619, the cars in question moved across a state highway protected by a crossing watchman; however, the engine pulling the cars was only forty to fifty feet from such crossing when the movement was initiated. Otherwise, the findings in the two cases are substantially the same.

■ ■ We think there are cases with facts sufficiently similar to those of the instant cases, particularly the decision of the Second Circuit and that of this court to which we have referred, which afford support for both of the opposing contentions made here. In United States v. Elgin, J. & E. Ry. Co., supra, this court ana-

lyzed and discussed numerous cases here relied upon, and a duplication of that effort would be little more than wasted energy. While, as pointed out, there is some slight difference in the facts of the instant cases, such difference is not of such significance as to require a different result. And the facts of both cases are sufficiently similar to those which we considered in United States v. Elgin, J. & E. Ry. Co., supra, to require, if we are to be consistent, the same holding as was made there.

Each of the judgments appealed from is Affirmed.